## THOMASON vs. DILL.

[ACTION ON NOTE GIVEN FOR PURCHASE-MONEY OF SLAVE.]

1. *Relevancy of evidence, on cross examination, showing relation of witness with party.*— A witness, having testified to what took place at an interview between the parties at plaintiff's house, may be asked, on cross examination, how he happened to go with defendant to plaintiff's house.

2. *When contract of sale is complete.*—Where the purchaser of a slave executes and delivers to the vendor his note for the purchase-money, and receives from the vendor a bill of sale, the sale is complete, and the title to the slave vests in the purchaser.

3. *Parol stipulations merged in written contract.*—An offer by the purchaser, pending the negotiation, to give security to his note for the purchase-money, is waived, by implication, if the vendor accepts a note without security.

4. *Sufficiency of consideration.*—A promise by the purchaser of a slave, after the consummation of the contract, to give a new note, with security, for the purchase-money, in consideration merely of a prior unaccepted offer, pending the negotiation, to give security, is *nudum pactum ;* but if the parties mutually agree to a subsequent modification of their contract, the promise of each is supported by a sufficient consideration.

5. *Delivery of bill of sale.*—When a bill of sale is delivered to the purchaser himself, neither party will be heard to assert that it was delivered only as an escrow.

6. *Discharge of contract.*—A release under seal is not now necessary to discharge a contract under seal.

7. *Bailment as pledge.*Where the purchaser of a slave, having acquired a perfect title by executed contract, afterwards agrees that the slave may remain in his vendor's possession, in pledge, until he gives a new note, with security, for the purchase-money,—his failure to give such note would not affect the title to the slave, but would merely confer on the vendor the right to sell the slave for the payment of his demand ; and—the death of the slave, before the execution and delivery of the note, would be the loss of the purchaser.

8. *Estoppel en pais against vendor.*—Where the vendor of a slave, still retaining possession by the permission of the purchaser, and being desirous to obtain a rescission of the contract, insists on the purchaser's giving a new note, with security, for the purchase-money, which the latter undertakes to do ; and the slave dies while in the vendor's possession, before the execution and delivery of the new note,—the vendor is not thereby estopped from recovering on the original note for the purchase-money.

APPEAL from the Circuit Court of Talladega.

Tried before the Hon. ROBERT DOUGHERTY.

THIS action was brought by John F. Dill against Francis M. Thomason, and was founded on the defendant's promissory note, under seal, for $800, the purchase-money of a slave. The defendant pleaded the general issue, in short by consent, with leave to give any special matter in evidence which might be a defense to the action; and plaintiff replied in like manner. The facts disclosed on the trial are thus stated in the bill of exceptions:

"After plaintiff had offered the note declared on, and rested, the defendant introduced William G. Riggs as a witness, who testified as follows: At defendant's invitation, witness went with him, from Ashville, where witness resided, to plaintiff's house. Defendant's purpose in going to plaintiff's house was, to make a purchase from him of a slave named Ellick, which defendant understood plaintiff wished to sell. When they arrived at plaintiff's house, he was absent. Witness and defendant went to plaintiff's field, where the slave was, and examined him; and when they returned to the house, plaintiff was at home. A conversation then ensued between plaintiff and defendant, in reference to the purchase of said negro; in the course of which conversation plaintiff said, that he had sold the negro once before, and had recanted, but that the negro had disobeyed him, and he now had to go. Plaintiff proposed to take $800 for the negro, and defendant agreed to give it. The negro was worth that amount. Defendant then said, that he had no money; and plaintiff replied, that he would take his notes. Defendant said, that he would give security, if plaintiff desired it. Plaintiff said, that he did not desire security—he had understood that defendant was getting rich; but, if he got uneasy, he would send the note over to his brother in Talladega county, where defendant lived, and defendant could secure it. Defendant then executed the note sued on, and delivered it to plaintiff, who then executed and delivered to defendant a bill of sale for said negro. Plaintiff sent to the field for the negro, and told him, when he came up, that he had sold him to Thomason. The negro commenced crying, and begged plaintiff to rescind the trade. Plaintiff's wife also requested him to rescind the trade;

and plaintiff told her, that she knew where the note was,—to get it, and see if Thomason would rue. Defendant refused to rue, and wanted to take the negro and start home that evening. Plaintiff remarked, that he would bring the negro, with his clothes, to Ashville the next morning. Witness and defendant then drove off in their buggy. Plaintiff brought the negro to Ashville the next morning. Witness then heard but little said between the parties. The first thing he heard was, a proposition by plaintiff to rescind; which defendant declined to do, saying that he never made a negro trade for less than $50. Witness then left, and did not hear the remainder of the conversation. Witness again went to where plaintiff, defendant and some others were, and heard plaintiff say to defendant, 'Brown has taught me that it is better to have security in all cases.' John J. Thomason then pulled out his pocket-book, containing money, and told plaintiff, in an excited manner, 'Let him [defendant] take the negro, I have got the money.' Witness then went out, and heard nothing more. Plaintiff did not bring the negro's clothes with him to Ashville, nor did the negro bring any clothes except what he had on. Defendant left Ashville, and returned to his home in Talladega, without the negro. The negro committed suicide a few days afterwards, being at the time in plaintiff's possession. On cross examination of this witness, plaintiff asked him this question: 'How did you happen to go with defendant to plaintiff's house?' Defendant objected to this question; but the court overruled the objection, and defendant excepted.

"John J. Thomason, another witness for defendant, testified, that on the morning after the said trade for the negro, having previously heard something of the trade, he had a conversation with defendant, and, immediately afterwards, went with him to plaintiff in Ashville, and told plaintiff that defendant was good. Plaintiff replied, that he thought so too, or knew so; that his wife was dissatisfied about the sale of the negro, and he would rather not make the trade. Witness also used the words, he wanted to rue the trade. Plaintiff further said, that de-

Thomason v. Dill.

fendant had promised to give security. Defendant and witness then had a conversation, (which the witness was not allowed to relate,) and then defendant went to where plaintiff was. Witness afterwards went to where plaintiff and defendant were conversing. When he got to where they were, plaintiff was refusing the security offered by defendant for the purchase-money of the negro. Witness then remarked to them, that defendant might take the negro along; that he had the money, and would pay for him,—at the same time pulling out the money. After a moment's reflection, witness said, that he would deposit the money for the negro, until defendant could go to Talladega and get security. Plaintiff said, 'No, the note is perfectly good;' but objected that some of the parties to the proposed note lived in St. Clair county, and some in Talladega. Plaintiff further said, that Brown had taught him always to have security, and that it was defendant's proposition to give security. Witness then persuaded defendant to rue with plaintiff, and rue without requiring any pay; but defendant declined. Plaintiff then said, that the negro had some debts due to him in the neighborhood, which he could collect in a few days; that he had a bed and some clothes; and that defendant could go to Talladega, get a note signed with security, come back in a few days, and bring the note, and get the negro.

"Daniel E. McCurry, another witness for defendant, testified, that he was at Ashville on the day after the said trade for said negro, and was there present at an interview between plaintiff and defendant; that the negro did not come up with plaintiff into the town; that he saw him standing in the road, some two hundred yards from plaintiff's house, and he was called up; that plaintiff offered defendant something to rue, which defendant declined; that plaintiff then said, that Brown had taught him to have security in all cases, and for defendant to let the negro stay a few days, until he [defendant] went and got the note, with security, and brought it to plaintiff, and he could take the negro.

"Alexander Grady, another witness for defendant, testi-

fied, that he was present at Ashville on the day after the said trade for said negro. Witness was to come to Talladega that day with defendant; and they had out their buggy, ready to start, before plaintiff came to town. Plaintiff came in, and the negro came up a short time afterwards. The negro was in his shirt sleeves, and had no clothes except what he wore; nor did plaintiff have the negro's clothes. A short time after they came up, witness heard a conversation between plaintiff and defendant. Plaintiff proposed to give defendant $10 to rue,—saying, that he had $5, and the negro $5. Defendant declined; and the plaintiff then said, 'If you wont rue, go and get security, as you promised, and come and take the negro.' A short time afterwards, witness was present at a conversation, when John J. Thomason, plaintiff, defendant and others were present. John J. Thomason, showing money, said to plaintiff, 'I have the money, and will deposit it,—let defendant take the negro along.' Plaintiff said, that he was satisfied, and that he knew the note was good. Something was said about plaintiff's wanting a note with all the makers in the same county. Plaintiff again proposed to rue, and defendant declined. Plaintiff then said, 'If you will have the negro any how, let him stay for a few days, and go over and get the note with security made, and bring over the note, and you can have the negro; he has some debts due him in the neighborhood, which he can collect, and he has a bed and some clothes.' Defendant then said, 'Now that it is a matter of honor, I will show that I can give security.' It was then said, that a note, with Huey & Bradford as sureties, would be satisfactory. Defendant told plaintiff to let Maj. Dean (a gentleman present) write a note which would be satisfactory, and he would take it and have it signed. Dean wrote the note; plaintiff expressed himself satisfied with it; defendant took it, and left in company with witness. The negro remained in plaintiff's possession. A few days afterwards, defendant delivered said note to witness, with the signatures of himself, Huey, Bradford, and J. T. Morgan, and requested witness to take and deliver it to plaintiff in St. Clair county, and get said negro. Witness

carried the note to plaintiff, and delivered it to him; and plaintiff said, 'This is just as defendant promised to do.' Witness told plaintiff, that he was instructed to demand the negro when he delivered the note; and plaintiff replied, that he could not deliver the negro, because he was dead, but that witness could have his body or his bones, if he desired them. Witness told him, that he had better give back said note; and plaintiff did so, saying that he would have things as they were when the negro died. Defendant told witness, before delivering said note to him, that he had heard up at Jacksonville that the negro was dead."

Plaintiff then read in evidence his bill of sale to defendant for said negro, which was produced by defendant on notice, and which was dated April 26, 1853; and he then introduced as witnesses William Edwards and one Box, whose testimony was as follows: "Edwards testified, that he heard part of a conversation between plaintiff and defendant, at Ashville, on the day after the said sale of said negro; that plaintiff said to defendant, 'Leave the negro for a few days, until he can collect some debts due him; he has a bed and some clothes, and you are not prepared to carry him,—you can come over in a few days, with a wagon, and get him;' and that he did not recollect anything else that was said. Box testified, that defendant and said Alexander Grady stayed all night at his house, on their way from Ashville to Talladega, in April, 1853. While there, defendant said, that he had bought a negro from plaintiff, and had left him with plaintiff, for a few days, to collect up some debts that were coming to him; that plaintiff had offered him $10 to rue, but he asked $50; and that he had made a good trade. Witness did not recollect all that defendant said; but, if he said more on that subject, witness did not recollect it. The conversation was in a general and social way, and defendant did not pretend that he was telling all the particulars of the purchase of said negro. Defendant also said, in that conversation, either that the negro was to come over to him, or that he was to send for the negro.

"This was all the evidence in the case; and thereupon the court charged the jury, among other things, as follows:

"1. That it required six requisites to a contract: "1st, a party capable of contracting; 2d, a party competent to contract with; 3d, a thing, or object, to be contracted for; 4th, a consideration; 5th, words expressing the terms; and, 6th, the assent of the minds of the contracting parties. To illustrate: Here was Thomason, a party capable of contracting; Dill, a party competent to contract with; the negro, the object to contract for; $800, the consideration; the note and bill of sale are expressive of the terms; and their execution, of the assent of the minds of both parties. The moment Thomason executed the note, and Dill the bill of sale, and delivered them each to the other, the title to the slave passed from Dill to Thomason, and the latter had the right to go into the field, where the negro was, and take possession of him. To this charge the defendant excepted.

"2. That if it was understood, before the execution of the note and bill of sale, that Thomason should give security for the purchase-money, the law presumes, as nothing of this kind appears in the papers, that this was waived, and that the note and bill of sale speak the true meaning of the parties. To this charge, also, the defendant excepted.

"3. That though the jury might believe every fact which took place at Ashville the next day, tending to show a rescission or alteration of the contract; yet this did not affect Thomason's title to the negro—it was still in him.

"The plaintiff asked the court to charge the jury,—

"1. That if they believed Thomason bought the negro of Dill, and took a bill of sale, and gave his individual note for him; and that the bill of sale and note were delivered respectively; and that Thomason afterwards promised, upon a point of honor, to give a new note, with security, at a subsequent day; and that Thomason left the negro with Dill, until he gave the new note; and that the negro died, or hung himself, without Dill's fault,—then the loss is Thomason's, and not Dill's.

"2. That if the negro remained with Dill after the sale, by permission of Thomason, this did not make Dill a

wrongdoer; and if the negro killed himself, or died without Dill's procurement, the loss must fall on Thomason, and not on Dill.

"3. That if the jury believed from the evidence, that Thomason gave the note sued on for the negro; and that Dill executed the bill of sale read in evidence; and that it was agreed between the parties, at the time these papers were executed, that Dill should send the note to Talladega, and Thomason should give security, if Dill became dissatisfied; and that Dill afterwards wanted to rue the bargain, and Thomason would not; and that Dill, for the purpose of compelling Thomason to agree to rue, then exacted from him a compliance of the agreement as to giving security, and insisted that the negro should remain in his possession until the note with security was given; and that the negro did so remain, without objection from Thomason; and that the negro, while remaining in his possession, before the note with security was made and delivered, hung himself,—then he died the property of Thomason, and Dill was entitled to recover."

The court gave these charges, and defendant reserved an exception to each one of them.

The defendant then requested the court to give the following charges to the jury:

"1. That if they believed from the evidence, that the note sued on was given for the purchase of a negro, by defendant from plaintiff; and that defendant complied with the obligations imposed on him by the contract of purchase; and that plaintiff, after being requested by defendant to deliver said negro to him, wrongfully withheld him from defendant, until said negro died in plaintiff's possession, never having been in defendant's possession,—then plaintiff cannot recover on said note.

"2. That if they believed from the evidence, that the note sued on was given for the purchase of a negro; that plaintiff, after said purchase, still retaining said negro in his possession, asserted to defendant, either by his conduct or words, that the title to said negro remained in him until defendant gave a note with security for the purchase-money; and that defendant acted upon such

assertion, no matter whether it was true or false, by leaving the negro in plaintiff's possession until he killed himself, within a few days after said purchase, and before the tender of the note hereinafter mentioned, and by taking upon himself the burden of preparing and tendering a note with security,—then plaintiff is estopped, in this case, from denying that the title to said negro remained in him up to his death.

"3. That if they believed from the evidence, that the note sued on was given for the purchase of a negro; that the bill of sale for said negro was delivered by plaintiff to defendant; that on the next day, before the negro passed into defendant's possession, a contract was made between plaintiff and defendant, that the title to said negro should revest and remain in Dill for a few days until defendant should have a note for the purchase-money, with security, executed and delivered to plaintiff; and that the negro remained in plaintiff's possession up to his death; and that defendant tendered to plaintiff, within a few days, a note secured to plaintiff's satisfaction, according to said last contract; and that the negro had died, before that time, in plaintiff's possession,—then the death of said negro was plaintiff's loss, and not defendant's.

"4. That if they believed from the evidence, that the note sued on was given for the purchase-money of a slave; and that it was understood between the parties, that the title to said negro should not vest in defendant until he gave a new note, with security, for the purchase-money, which was to be done in a few days; and that it was understood between the parties, that the negro should remain in plaintiff's possession until such note was given; and that the negro did accordingly remain in his possession until, within such few days, the negro killed himself; and that defendant, within a few days, and after the death of the negro, tendered a note, with good security, in accordance with said contract, upon the condition that the negro was delivered to him; and that the plaintiff replied, he could not deliver the negro because he was dead,—then the death of the negro was plaintiff's loss,

notwithstanding he may, at the time of said sale, have delivered the bill of sale for said negro to defendant,"

The court refused to give these charges, and the defendant excepted to each refusal.

The assignments of error embrace all the rulings of the court, to which, as above shown, exceptions were reserved.

JAMES B. MARTIN, and WM. P. CHILTON, for appellant.—1. Admitting that the contract for the sale of the slave was completed on the first day, yet the testimony of Riggs, Thomason, Grady and McCurry is strongly persuasive to show an essential modification of that contract on the following day; and this new agreement is supported by a sufficient consideration.—Langford v. Cummings & Cooper, 4 Ala. 46; Pharr & Beck v. Bachelor, 3 Ala. 237; Borum v. Garland, 9 Ala. 52; Young v. Fuller, 29 Ala. 464; Parsons on Contracts, vol. 2, p. 190.

2. A party cannot, after violating a contract, and repudiating all its burdens, enforce it against the other. Dill here sues to reap the advantages of his contract, and Thomason has a right to recoup the damages sustained by plaintiff's violation of it.—Hatchett v. Gibson, 13 Ala. 587; Batterman v. Pierce, 3 Hill, 171; 8 Wendell, 109; 25 ib. 669.

3. Dill was bound to deliver the negro, or offer to deliver him, before he could maintain an action for the purchase-money.—Potter v. Coward, Meigs' R. 22. His refusal to deliver the slave, as the contract bound him to do, was a conversion.—Glaze v. McMillion, 7 Porter, 279; Gray v. Crocheron, 8 Porter, 191.

4. Under the facts supposed in the second charge requested by the defendant, plaintiff was estopped from recovering on the first note.—McCravey v. Remson, 19 Ala. 430; Moore v. Levert, 24 Ala. 310; Miller v. Jones' Adm'r, 26 Ala. 247; 9 Barn. & Cress. 577; 1 Ad. & El. 469.

WHITE & PARSONS, and B. T. POPE, contra.—1. The contract of sale was complete, on the execution and delivery by the respective parties of the bill of sale and

note for the purchase-money.—Newman v. James, 12 Ala. 29; McCutchen v. McCutchen, 9 Porter, 650.

2. All parol stipulations, prior to the consummation of the contract, are merged in the writing.—Melton v. Watkins, 24 Ala. 436; Seay v. Marks, 23 Ala. 532; West v. Kelly, 19 Ala. 353; Gordon v. Phillips, 13 Ala. 567; Pierson v. Hooker, 3 Johns. 68.

3. Thomason's subsequent promise to give security for the purchase-money, not being supported by a new consideration, was *nudum pactum*.—Caraway v. Wallace, 2 Ala. 542; Hussey v. Thornton, 4 Mass. 405; Chapman v. Lathrop, 6 Cowen, 110; Leavitt v. Smith, 7 Ala. 182; 23 Wendell, 109; Hunt v. Barefield, 19 Ala. 117; Randolph v. Perry, 2 Porter, 376; 19 Pick. 275.

4. The plaintiff's possession of the negro being lawful, his failure to deliver after the death of the slave was not a conversion.—4 Esp. 156; 4 Wendell, 613; 1 Chitty on Pleading, 157.

STONE, J.—There was no error in allowing the question on cross examination, which was objected to by the appellant. The relations which the witness sustains to the parties, are always admissible, as shedding some light on the credibility of the witness.—1 Greenl. on Ev. § 446.

The stipulations and agreements entered into, and reduced to writing, on the 26th April, 1853, amounted to an executed contract, passing the title of the slave to Thomason, and securing the payment of the purchase-money to Dill.—McCutchen v. McCutchen, 9 Porter, 656–7; Newman v. James, 12 Ala. 32.

The offer, or agreement by Thomason, pending the negotiation, to give sureties to the note, if demanded by Dill, was waived by the latter, by implication, when he accepted the note of the former without surety. When a contract is reduced to writing, all previous agreements and specifications are merged in the writing; and, in the absence of fraud and mistake, stipulations left out of the writing, are considered as abandoned.—Melton v. Watkins, 24 Ala. 436; Gordon v. Phillips, 13 Ala. 567; Seay v. Marks, 23 Ala. 532; West v. Kelly, 19 Ala. 353; Pier-

son v. Hooker, 3 John. 68; Chapman v. Lathrop, 6 Cow. 109.

The agreement by which the slave was permitted to remain one night with Dill, was subsequent to the contract, and formed no part of it. It had no effect to impair Thomason's title to the slave.

The testimony of the several witnesses who were examined, as to what took place between the parties in Ashville on the 27th, clearly shows that Dill desired an entire rescission of the contract, and resorted to many expedients to accomplish his object; while, on the other hand, Thomason refused to make an entire rescission, except on terms which were not acceded to. At the close of their interviews and altercations, they agreed that Thomason should have a new note executed, with certain named sureties; and Dill should retain the possession of the slave for a few days. They separated; Thomason retaining the bill of sale, and Dill retaining the note. It is contended for appellant, that the agreement of the second day was a rescission of the contract of the first, and that the parties then made a new executory contract. On the other hand, it is contended for appellee, that the promise by Thomason, to give a new note with sureties, was without consideration, and imposed no obligation on him.

A promise, no matter how solemn or formal, cannot be enforced, if it be without consideration.—1 Parsons on Contracts, 353; Chitty on Contracts, (8th American, from 4th London ed.) 25–6. So, a promise made on a consideration wholly past and executed, is equally invalid, unless such consideration was moved by the precedent request, either express or implied, of the party promising.—Chitty on Con. 61; 1 Parsons on Con. 391, 395–6. If the agreement of the second day was nothing more than a promise by Thomason to give sureties, in consideration of his offer to do so made pending the negotiation, then it was a nude pact, and neither imposed any obligation on him, nor divested the title of the slave out of him.—Jackson v. Jackson, 7 Ala. 791. A promise is a good consideration to support a promise.—Chitty on Contracts, 46, and note 1. Parties, before or after the consummation of a

contract, may either rescind or modify it; and no other consideration is necessary to support such contract of rescission or modification, than the mutual agreement of the parties.—Borum v. Garland, 9 Ala. 452; Lightfoot v. Strahan, 7 Ala. 444; Langford v. Cummings, 4 Ala. 46; Murphy v. Barefield, 27 Ala. 634; Hussey v. Roquemore, ib. 281.

In Howe v. O'Malley, 1 Murphy, 287, the plaintiff had conveyed to defendant a tract of land, containing 221 acres, more or less. Some years afterwards, they mutually agreed to have the land surveyed; and if it was found to contain more than 221 acres, the defendant agreed to pay the plaintiff $10 per acre for the excess; and if it fell short, plaintiff was to refund to defendant at the same rate. This was held a sufficient consideration to support the promise.

In Young v. Fuller, 29 Ala. 464, this court upheld and enforced an agreement, which was nothing more than a modification of a contract previously consummated, and rested on no other consideration than the mutual agreement of the parties.

The bill of sale having been delivered to the grantee, neither party will be heard to assert that it was delivered as an escrow, to be operative only on a contingency.— Morgan v. Smith, Wykoff & Nicholl, 29 Ala. 283, and authorities cited; Warren v. Sprowls, 2 Marsh. Ky. 533–4.

This principle, however, does not deny to the parties the right to make a subsequent contract in reference to the same property. Title to slaves may be conveyed without writing; and if the parties mutually agreed to a change of their contract, by which the *title* to the slave was to remain in Dill, until Thomason tendered him a note with sureties, then such contract will be upheld.— See Young v. Fuller, *supra*. If this should be found to be the agreement, then, until Thomason complied, the title continued in Dill; and the death, at that time, of the slave, would be his loss.

Anciently, sealed contracts could only be discharged by a release under seal. That is not now the law.—Wallis v. Long, 16 Ala. 740; 2 Story's Equity, § 770, and note 3; Rowley v. Rice, 10 Metcalf, 7.

There is, perhaps, another point of view, in which this testimony may be considered. The parties may have intended and agreed to annul the contract of the first day, so far as to discharge the note that day executed, and leave the slave with Dill, in pledge that the note with sureties would be delivered to him. If such was the agreement, and they did not consent to any modification of Thomason's title to, or right in the slave, then the slave continued Thomason's, and the loss would be his, although he may have had no present right to recover the possession.—Story on Bailments, §§ 286, 287. If this was the contract, then a failure or default by Thomason would not vest in Dill the title to the slave, but would merely confer on him a right to sell the property pledged, for the payment of his demand. Until a sale, Thomason would have the right to redeem by paying the debt; and any surplus of proceeds, after paying the debt and expenses, would belong to him.—Story on Bailments, §§ 300, 303, 308. This may be looked to as one of the tests by which to determine the character of the agreement of the second day; and if this was the agreement, Dill had no right of action on the note first executed.

We hold, then, that the testimony was not so entirely clear, the agreement of the parties not so entirely unambiguous, as to justify the court below in taking from the jury the consideration of its effect. We do not wish to be understood as intimating an opinion on its preponderances. We think, however, that it should have been left to the jury, under appropriate instructions, to ascertain by their verdict,—1st, whether the agreement of the second day was nothing more than a promise by Thomason to give a note with sureties, pursuant to his offer of the day before, without any surrender or modification of his right to the slave; 2d, whether the first note was considered inoperative, and the slave left with Dill in pledge that Thomason would give a new note with stipulated sureties; or, 3d, whether by agreement the first contract was so far modified, as to be made executory,—Thomason's *right* to the slave not to attach until he executed and tendered the proposed note. If either the first

or the second proposition be affirmed by the jury, the plaintiff, on a suitable complaint, will be entitled to a verdict. The third proposition would entitle the defendant to a verdict.

We need not apply these principles to the several charges given and refused. The third charge *asked* by defendant should have been given, and its refusal was error. The third charge *given* by the court was also erroneous, but it was not excepted to.

We have made no allusion to those assignments of error which seek to charge Dill for tortiously withholding the possession. The testimony shows that the slave remained with him, in each instance, by Thomason's permission.

Neither is there anything in this case, which justifies the application of the doctrine of estoppel.—Edmondson v. Montague, 14 Ala. 371; Andrews v. McCoy, 8 Ala. 720; Clements v. Loggins, 2 Ala. 514; Ware v. Cowles, 24 Ala. 446; Finn v. Barclay, 15 Ala. 626; Griggs v. Woodruff, 14 Ala. 9; Sweet v. Jacocks, 6 Paige, 355; Mosely v. Lane, 27 Ala. 62.

For the error above pointed out, the judgment of the circuit court is reversed, and the cause remanded.

WALKER, J., not sitting.